# WL| Wright Law
### ATTORNEY AT LAW

---

**299 BROADWAY, SUITE 708**
**NEW YORK, NY 10007**
**OFFICE (212) 822-1419 • FACSIMILE (212) 822-1463**
wrightlawnyc@gmail.com
www.wrightlaw.nyc

January 29, 2024

**VIA ECF**
Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

            **Re:**    *United States* **v.** *Max Eugene (22-200 RPK)*

Dear Judge Kovner,

    **I.**       **Preliminary Statement**

    The undersigned respectfully submits this letter in advance of Max Eugene's ("Max") sentencing proceeding, which is scheduled for February 7, 2023, following his May 19, 2023 guilty plea, to Count One: Conspiracy to Distribute and Possess with Intent to Distribute Cocaine in violation of 21 U.S.C. §846 and §841(b)(1)(C).

    It is a universally acknowledged truth that acknowledging one's transgression is the first step towards redemption. That is precisely what Max Eugene did following his arrest, by admitting his criminal conduct and participating in a Safety Valve proffer where he forthrightly and honestly disclosed his offense conduct.

    As detailed below Max comes from a large and loving family who have all supported him during this difficult period in his life. Max is a 43 year old man who is a deeply beloved son, sibling, and friend to many people; Max now finds himself on a hopeful road to redemption and the reclamation of his life. Unfortunately for Max his adulthood has been marked by catastrophic mistakes with self-imposed obstacles that have often become intractable challenges. Max makes no excuses for his offense conduct and wakes up every morning with the crushing awareness of the gravity and consequence of his criminal conduct; conduct for which he readily accepted responsibility, proffered with the government, pled guilty and now stands ready to be sentenced.

1

## II. Legal Standard

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the U.S.S.G guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

In determining a sentence for Max that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of Max. A consideration of those characteristics, along with the remaining six factors,[1] may render sentences that do not fit within the guidelines, yet are fair and meet the goals of sentencing set forth in § 3553(a)(2).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 50. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 552 U.S. at 101, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, at 54; *see also Rita v.*

---

[1] The seven factors are (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. *See* 18 U.S.C. § 3553(a).

*United States*, 551 U.S. 338, 351 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

### III. Guidelines Calculation

Max has satisfied the conditions of 18 U.S.C. §3553(f)(1)-(5) and U.S.S.G. §5C1.2, he therefore qualifies for "safety valve" relief, and is eligible for a two-level reduction in his offense level. PSR ¶37; Gov. Sent. Memo at 2. The plea agreement and the presentence report ("PSR") are largely in accord regarding the guideline calculations, however there is a significant discord regarding the PSR two-level "stash house" enhancement under U.S.S.G. §2D.1(b)(12). PSR ¶38. As a consequence the PSR calculates an offense level of 21 and a guidelines range of 37 to 46 months (PSR ¶94); whereas the plea agreement contemplates an offense level of 19 and a guidelines range of 30 to 37 months. Govt. Sent. Memo at 2. The plea agreement and the PSR are in agreement that Max has zero criminal history points and he therefore falls within Criminal History Category I. PSR ¶¶51-52; Govt. Sent. Memo at 2.

We object to the Probation Department's two-level enhancement and its mistaken rationale that this enhancement is warranted "because the defendant stored a quantity of narcotics at his residence." PSR ¶38. Second Circuit law is clear that the "stash house" §2D1.1(b)(12) enhancement is analyzed under a totality of circumstance test, and this enhancement only applies where the narcotics distribution is "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses of the premises." *United States v. Vinales*, 78 F.4th 550, 552 (2d Cir. 2023) (quoting U.S.S.G. §2D1.1 cmt. n. 17), *see also United States v. Job*, 851 F.3d 889, 909 (9th Cir. 2017). The very report prepared by Probation, the PSR, demonstrably establishes that the premises in question is *not* used primarily or principally to distribute narcotics. Rather, the premises has been Max's sole residence since 2004, when his elderly mother purchased the home; and Max currently lives there with his 76 year old mother and his 35 year old sister. PSR ¶¶57, 58, 60, 63. There are no allegations that narcotic sales or transactions occurred at his residence. Unquestionably, Max uses this premises as his own residence and the residence of his family and as a consequence the §2D1.1(b)(12) enhancement is inapposite.

Subsequent to the instant plea agreement, the United States Sentencing Commission promulgated new rules effective as of November 1, 2023, providing an additional two-level decrease for first time, nonviolent offenders like Max who satisfy ten criteria. U.S.S.G. §4C1.1. This reduction in offense level will apply to defendants: (1) with no criminal history points, (2) who did not receive a terrorism enhancement, (3) who did not use violence or threats of violence, (4) who did not cause death or serious injury, (5) who did not commit a sex offense, (6) who did not cause any victim substantial financial hardship, (7) who did not possess or use a firearm or deadly weapon, (8) who did not violate a victim's civil rights, (9) who did not commit a hate crime, and (10) who did not receive an aggravating role adjustment. U.S.S.G. §4C1.1. The government does not contest that Max satisfies all of the required criteria and is therefore entitled to an additional two-level reduction in his offense level.

Accordingly, we request that the Court apply this 2-level decrease to Max's offense level, which would reduce his offense level from 19 to 17 and under Criminal History Category I result in a guidelines range of 24 to 30 months.

The defense respectfully requests a sentence of house arrest or any sentence significantly below the guidelines range that the Court deems just and appropriate; a sentence which accurately reflects Max's acceptance of responsibility, his Safety Valve proffer, his individual history and characteristics, and the nature of his offense conduct.

### IV.     Offense Conduct and Acceptance of Responsibility

As described in the Presentence Report, Max conspired with his co-defendant, Herbert Whitely, to distribute cocaine and crack cocaine in Brooklyn and Queens from March 2021 up until March 2022. PSR ¶¶10-29. More specifically, Max first appears in the conspiracy in September 2021 as a narcotics supplier to Whitley. PSR ¶12. To be sure, Max's narcotics sales to Whitely date back to the start of the conspiracy in March 2021. PSR ¶¶13-14. Over the course of the conspiracy Max made multiple controlled sales to Whitely. PSR ¶¶16-26. Although Max was accurately characterized as a "supplier" to Whitely, Max is nonetheless "viewed as a street-level drug dealer who cannot be described as an organizer, leader, manager, or supervisor of the narcotics trafficking conspiracy." PSR ¶29.

In his Safety Valve proffer with the government Max was candid and sincere about his criminal behavior in this case; in essence, Max would supply Whitely with cocaine and deliver the drugs to Whitely at various locations throughout Brooklyn and Queens.

To be sure, Max readily concedes that his role as a "street level drug dealer" does not minimize his offense conduct or the risks attendant to any narcotics transaction. Max has expressed profound remorse when he reflects upon his offense conduct and he readily admits that narcotics sales are "*not* victim-less crimes." Max accepts that although his role in this conspiracy was not as an organizer or manager, he in no-way seeks to minimize his offense conduct and admits he was well aware of his illegal and dangerous conduct. Max further categorically accepts his indispensable role in this offense conduct and more meaningfully he accepts his shameful role in our nation's existential struggle with narcotics abuse.

### V.     Max's History and Personal Characteristics

Max was born in Brooklyn in 1981 to hardworking and loving Haitian immigrant parents who labored to provide Max with a good childhood and instill a work ethic despite their financial struggles. PSR ¶¶57, 59. Max's mother in particular has been a constant source of love and support, which continues unabated to this day as he resides at his mother's house. Id. After high school Max attended Nassau County Community College where in 2009 he obtained an associate's degree in business administration. PSR ¶78. He subsequently attended Baruch College in Manhattan majoring in finance in 2010. PSR ¶77. Tragically, Max had the benefit of a college education and he has failed to use that fortunate advantage to better his life. Rather Max has yielded to the temptation of "easy money" by engaging in the instant offense conduct.

Max's predominate employment in adulthood has been as a security guard at various bars and clubs around New York City. PSR ¶83. He readily admits this type of employment was not steady and has made it difficult for him to lead a more stable and mature life. Paradoxically, his

4

arrest in this case made him realize the need for more stable employment and as detailed below Max has opened up his own business.

Attached to this memo are a collection of letters from Max's family and friends.[2] Max's sister Nandy describes him as a kind and loving brother and attentive uncle to her two young children. Nandy further attests to Max's invaluable assistance to their elderly mother as she struggles with a number of medical ailments. The assembled letters extol Max's resolute commitment to helping other people and his dogged work ethic. They are also letters of redemption and hope for a better and prosperous future for Max. Ultimately, the abundant love demonstrated by Max's kind and generous friends and family turned out to be bittersweet, albeit due to his regretful decision to engage in the instant offense conduct.

Max has been at liberty over the last two years this case has been pending and certainly the Court is well aware that Max has struggled at times while under pre-trial supervised release. Probation details those struggles at great length. PSR ¶¶3-8. Max is deeply remorseful for those violations and having to appear in court to answer for those violations had a deeply sobering effect. This is reflected in that over the last 9 months while on supervised release Max has not incurred any new violations of his release. PSR ¶9.

To be sure, Max has endeavored during this time at liberty to be a constructive member of society by operating his own franchise of a Mr. Softee ice cream truck in Long Island. PSR ¶¶82, 88. The Probation Department confirmed Max's ownership and the business loans Max secured to help get his business off the ground. Id. Max has been able to gross upwards of $9,000 per month from his Mr. Softee truck helping to provide for himself and his family. ¶82. Max is abundantly proud of this business and his eternal hope is that he remains at liberty so he may continue to grow his business.

Illustrative of Max's work ethic is a heartfelt letter from Max's childhood friend, Rakeem, who is a retired police officer and U.S. Army staff sergeant:

> I can personally attest to Max character as an ambitious business owner and a financial provider for his family. Currently, Max is a successful franchise owner of Mr. Softee ice cream truck serving children and adults in his community. Max also mentors young African American teenage boys in his community about the importance of business entrepreneurship and credit repair.

Max deeply feels the betrayal, disgrace, and humiliation his behavior has caused his friends and family as well as the incalculable harm that narcotics visit on society. Despite his current predicament, Max counts himself very lucky that he has so many good people who love him and want to help him as he struggles through life and moves on from the instant criminal case.

Max has also struggled through a number of serious physical injuries throughout his adulthood, some of those injuries were the result of his employment as a security guard. PSR

---
[2] Attached as Exhibit A are a collection of letters from Max's family and friends.

¶¶65-71. The collective harm from these injuries continue to haunt Max to this day and unfortunately he has used marijuana to self-medicate his physical and emotional pain. PSR ¶75.

## VI. Conclusion

As mentioned at the outset of this memorandum, we respectfully request the Court impose the sentence of house arrest; a sentence that appropriately reflects all of the critical 18 U.S.C. 3553(a) factors.

First, Max has continued to show remorse and reflect on how his criminal conduct affected society, drug abusers, his family; and a sentence of house arrest with a period of years of supervision will undoubtedly serve as a deterrent against any future recidivism. Max has confided that the last two year this case has been pending have been deeply impactful upon him and he is unyielding in his desire to turn his life around.

Two, while nothing can overstate the seriousness of the offense conduct in this case — Max distributed cocaine and crack cocaine — the lengthy sentence provided by the Guidelines does not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to meet the sentencing statute's goals. While lawmakers are understandably anxious to address our nation's drug crisis, there is simply no empirical evidence that tougher prison sentences in line with the Guidelines are an effective means of deterrence in drug cases. See *United States v. Diaz*, No. 11-CR-00821 (JG), 2013 WL 322243, at * 1 (E.D.N.Y. Jan. 2013) ("the Guidelines ranges for drug trafficking offense are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more.").

Third, Max's struggle with a number of physical ailments is another basis for the requested sentence. Sentencing courts are mandated to consider the need to provide medical care for defendants and Max's medical conditions certainly qualify. *See* 18 U.S.C. § 3553(a)(2)(D). As discussed in his PSR report Max has been treated for a number of serious physical ailments and he would unquestionably benefit from continued treatment for those ailments. To that end we respectfully request the Court consider his need and desire to receive treatment for his medical conditions. The PSR further recommends substance abuse treatment for Max in light of his marijuana use.

Fourth, Max's successful business venture with his Mr. Softee franchise and his invaluable help to his family demonstrate that Max can serve the needs of society while at liberty. A sentence of imprisonment will not only disrupt Max's recent success but will have far more impactful damaging consequences on his family. Max's friend Johny strikes the appropriate redemptive cord writing that Max "will emerge a better person… who deserves a chance."

We respectfully request the Court sentence Max to a term of house arrest or any sentence significantly below the guidelines range that the Court deems just and appropriate; needless to say we are cognizant that this request is a significant variance from the guideline range. However, it accurately reflects the unique circumstances of this case and the individual that is

Max. In sum, the significantly below guideline sentence as requested by the defense would properly account for Max's role in this offence, his prompt acceptance of responsibility, his Safety Valve proffer, his medical conditions, his lack of criminal record and his compelling personal history.

                                          Sincerely,
                                          /s/
                                          Christopher Wright